# EXHIBIT 'A'

**ASSET PURCHASE AGREEMENT**

by and between

**JOHNSTON & RHODES BLUESTONE CO.**

and

**ADEN MINING & MATERIALS, INC.**

dated as of

October 24, 2024

TABLE OF CONTENTS

ARTICLE I DEFINITIONS ................................................................................................. 1

ARTICLE II PURCHASE AND SALE ............................................................................... 7

Section 2.01    Purchase and Sale of Assets ................................................................ 7

Section 2.02    Excluded Assets .................................................................................. 9

Section 2.03    Assumed Liabilities ............................................................................ 9

Section 2.04    Excluded Liabilities ............................................................................ 9

Section 2.05    Purchase Price .................................................................................. 11

Section 2.06    Financing Contingency .................................................................... 11

Section 2.07    Allocation of Purchase Price ............................................................ 11

Section 2.08    Withholding Tax ................................................................................ 11

Section 2.09    Third Party Consents ........................................................................ 11

Section 2.10    Deposit .............................................................................................. 12

ARTICLE III CLOSING .................................................................................................. 12

Section 3.01    Closing .............................................................................................. 12

Section 3.02    Closing Deliverables ........................................................................ 12

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLER ...................... 13

Section 4.01    Organization and Qualification of Seller .......................................... 14

Section 4.02    Authority of Seller ............................................................................ 14

Section 4.03    No Conflicts; Consents ..................................................................... 14

Section 4.04    [Reserved] ......................................................................................... 14

Section 4.05    Assigned Contracts ........................................................................... 14

Section 4.06    Title to Purchased Assets ................................................................. 15

Section 4.07    Condition and Sufficiency of Assets ................................................ 15

Section 4.08    Real Property. ....................................................................................... 15

Section 4.09    Intellectual Property. ............................................................................. 16

Section 4.10    Insurance. ............................................................................................. 17

Section 4.11    Legal Proceedings; Governmental Orders. ............................................ 17

Section 4.12    Compliance With Laws; Permits. ........................................................... 17

Section 4.13    Environmental Matters. .......................................................................... 18

Section 4.14    Taxes. ................................................................................................... 18

Section 4.15    Brokers. ................................................................................................ 19

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ........................................ 19

Section 5.01    Organization of Purchaser. .................................................................... 19

Section 5.02    Authority of Purchaser. .......................................................................... 19

Section 5.03    No Conflicts; Consents. .......................................................................... 19

Section 5.04    Brokers. ................................................................................................ 19

Section 5.05    Sufficiency of Funds. ............................................................................. 19

Section 5.06    Legal Proceedings. ................................................................................ 20

ARTICLE VI COVENANTS .................................................................................................... 20

Section 6.01    Bankruptcy Sale Order. .......................................................................... 20

Section 6.02    Certain Bankruptcy Undertakings by Seller. ........................................... 20

Section 6.03    Due Diligence. ...................................................................................... 21

Section 6.04    Risk of Loss; Casualty and Condemnation. ............................................. 22

Section 6.05    Conduct of Business Prior to the Closing. ............................................... 23

Section 6.06    Access to Information. ........................................................................... 23

Section 6.07    Notice of Certain Events. ....................................................................... 23

Section 6.08    Confidentiality. ..................................................................................... 24

iii

Section 6.09    Governmental Approvals and Consents. ..................................................... 24

Section 6.10    Closing Conditions. ................................................................................. 25

Section 6.11    Public Announcements. ........................................................................... 25

Section 6.12    Transfer Taxes. ....................................................................................... 25

Section 6.13    Property Taxes and Other Adjustments. .................................................... 25

Section 6.14    Seller Name and Logo. ............................................................................ 25

Section 6.15    1031 Exchange. ...................................................................................... 26

Section 6.16    Further Assurances. ................................................................................ 26

ARTICLE VII CONDITIONS TO CLOSING ............................................................... 26

Section 7.01    Conditions to Obligations of All Parties. .................................................. 26

Section 7.02    Conditions to Obligations of Purchaser. ................................................... 26

Section 7.03    Conditions to Obligations of Seller. ......................................................... 28

ARTICLE VIII SURVIVAL ........................................................................................ 29

Section 8.01    Survival. ................................................................................................ 29

ARTICLE IX TERMINATION ..................................................................................... 29

Section 9.01    Termination. ........................................................................................... 29

Section 9.02    Effect of Termination. ............................................................................. 30

ARTICLE X MISCELLANEOUS .................................................................................. 30

Section 10.01    Expenses. ............................................................................................. 30

Section 10.02    Notices. ................................................................................................ 30

Section 10.03    Interpretation. ....................................................................................... 31

Section 10.04    Headings. ............................................................................................. 31

Section 10.05    Severability. .......................................................................................... 31

iv

Section 10.06    Entire Agreement. ............................................................................................ 32

Section 10.07    Successors and Assigns. .................................................................................... 32

Section 10.08    No Third-Party Beneficiaries. ......................................................................... 32

Section 10.09    Amendment and Modification; Waiver. ........................................................... 32

Section 10.10    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial. .............. 32

Section 10.11    Specific Performance. ...................................................................................... 33

Section 10.12    Counterparts. .................................................................................................... 33

4854-1597-0263, v. 7

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of October 24, 2024 (the "Effective Date"), is entered into by and between **Johnston & Rhodes Bluestone Co.**, a New York corporation and debtor-in-possession ("Seller") under Case No. 24-35235(CGM) (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of New York Poughkeepsie Division (the "Bankruptcy Court"), and **Aden Mining & Materials, Inc.**, a New York corporation ("Purchaser"). Seller and Purchaser are sometimes referred to herein, individually, as a "Party" and, collectively, as the "Parties."

## RECITALS

**WHEREAS**, on March 7, 2024, Seller commenced the Bankruptcy Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the Bankruptcy Court;

**WHEREAS**, prior to ceasing its operations in August of 2023, Seller had been engaged in the business of quarrying, fabricating and distributing of bluestone and other stone products (the "Business");

**WHEREAS**, Seller wishes to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 363 and 365 and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities of Seller, upon the terms and subject to the conditions set forth in this Agreement (collectively referred to as the "Transaction");

**WHEREAS**, Purchaser desires to purchase and take delivery of the Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions;

**WHEREAS**, the Purchased Assets will be sold pursuant to a Sale Order of the Bankruptcy Court approving such sale under Section 363 of the Bankruptcy Code and such Sale Order will include the assignment and assumption of certain executory contracts, unexpired leases and liabilities thereunder, under Section 365 of the Bankruptcy Code and pursuant to the terms and conditions of this Agreement; and

**WHEREAS**, on July 11, 2024, the Bankruptcy Court entered that certain *Order (I) Approving Bid Procedures for the Sale of Substantially All Debtor's Assets Free and Clear of All Liens, Claims, Interests and Encumbrances Pursuant to Sections 363 and 365 of the Bankruptcy Code, (II) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Leases and (III) Scheduling an Auction and Sale Hearing* (the "Bid Procedures Order") pursuant to which the Bankruptcy Court, *inter alia*, approved Purchaser as a "Qualified Bidder" and authorized Seller to enter into an asset purchase agreement with Purchaser, subject to the terms of the Bid Procedures Order and the bidding procedures attached as Exhibit 1 to the Bid Procedures Order (the "Bidding Procedures").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

The following terms have the meanings specified or referred to in this ARTICLE I:

"Action" means any claim, action, cause of action, demand, lawsuit, arbitration, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena or investigation of any nature, civil, criminal, administrative, regulatory or otherwise, whether at law or in equity.

"Affiliate" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or

indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" has the meaning set forth in the preamble.

"Ancillary Documents" means the Bill of Sale, the Assignment and Assumption Agreement, the Intellectual Property Assignments, the Deeds, the Assignment and Assumption of Leases, the Consulting Agreement, and the other agreements, instruments and documents required to be delivered at the Closing.

"Assigned Contracts" has the meaning set forth in Section 2.01(b).

"Assignment and Assumption Agreement" has the meaning set forth in Section 3.02(a)(ii).

"Assignment and Assumption of Lease" has the meaning set forth in Section 3.02(a)(vi).

"Assumed Leased Real Property" has the meaning set forth in Section 2.01(e).

"Assumed Liabilities" has the meaning set forth in Section 2.03.

"Bankruptcy Code" means 11 U.S.C. Section 101, et. seq. and any amendments thereof.

"Benefit Plan" means any pension, benefit, retirement, compensation, employment, consulting, profit-sharing, deferred compensation, incentive, bonus, performance award, phantom equity, stock or stock-based, change in control, retention, severance, vacation, paid time off (PTO), medical, vision, dental, disability, welfare, Code Section 125 cafeteria, fringe-benefit and other similar agreement, plan, policy, program or arrangement (and any amendments thereto), in each case whether or not reduced to writing and whether funded or unfunded, including each "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not tax-qualified and whether or not subject to ERISA, which is or has been maintained, sponsored, contributed to, or required to be contributed to by Seller for the benefit of any current or former employee, officer, director, retiree, independent contractor or consultant of the Business or any spouse or dependent of such individual, or under which Seller or any of its ERISA Affiliates has or may have any Liability, or with respect to which Purchaser or any of its Affiliates would reasonably be expected to have any Liability, contingent or otherwise.

"Bill of Sale" has the meaning set forth in Section 3.02(a)(i).

"Books and Records" has the meaning set forth in Section 2.01(n).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York are authorized or required by Law to be closed for business.

"Casualty" has the meaning set forth in Section 6.04(a).

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.

"Closing" has the meaning set forth in Section 3.01.

"Closing Date" has the meaning set forth in Section 3.01.

"Code" means the Internal Revenue Code of 1986, as amended.

"Consulting Agreement" has the meaning set forth in Section 3.02(a)(vii).

"Contracts" means all contracts, leases, deeds, mortgages, licenses, instruments, notes, commitments, undertakings, indentures, joint ventures and all other agreements, commitments and legally binding arrangements, whether written or oral.

"Copyrights" has the meaning set forth in the definition of Intellectual Property.

"Cure Costs" means all amounts that must be paid pursuant to Section 365(b) of the Bankruptcy Code in connection with the assignment and assumption of the Assigned Contracts to Purchaser as provided in this Agreement.

"Deed" has the meaning set forth in Section 3.02(a)(iv).

"Deposit" has the meaning set forth in Section 2.05.

"Disclosure Schedules" means the Disclosure Schedules delivered by Seller concurrently with the execution and delivery of this Agreement.

"Due Diligence Period" has the meaning set forth in Section 6.03(a).

"Encumbrance" means any charge, claim, community property interest, pledge, condition, equitable interest, lien (statutory or other), option, security interest, mortgage, easement, encroachment, right of way, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income or exercise of any other attribute of ownership.

"Environmental Claim" means any Action, Governmental Order, lien, fine, penalty, or, as to each, any settlement or judgment arising therefrom, by or from any Person alleging liability of whatever kind or nature (including liability or responsibility for the costs of enforcement proceedings, investigations, cleanup, governmental response, removal or remediation, natural resources damages, property damages, personal injuries, medical monitoring, penalties, contribution, indemnification and injunctive relief) arising out of, based on or resulting from: (a) the presence of, Release of, or exposure to, any Hazardous Materials; or (b) any actual or alleged non-compliance with any Environmental Law or term or condition of any Environmental Permit.

"Environmental Law" means any applicable Law, and any Governmental Order or binding agreement with any Governmental Authority: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient or indoor air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Materials. The term "Environmental Law" includes, without limitation, the following (including their implementing regulations and any state analogs): the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 et seq.; the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976, as amended by the Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 et seq.; the Federal Water Pollution Control Act of 1972, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 et seq.; the Toxic Substances Control Act of 1976, as amended, 15 U.S.C. §§ 2601 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 et seq.; the Clean Air Act of 1966, as amended by the Clean Air Act Amendments of 1990, 42 U.S.C. §§ 7401 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act of 1910, as amended, 7 U.S.C. §§ 136 et seq.; the Oil Pollution Act of 1990, as amended, 33 U.S.C. §§ 2701 et seq.; and the Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 et seq.

4854-1597-0263, v. 7

"Environmental Notice" means any written directive, notice of violation or infraction, or notice respecting any Environmental Claim relating to actual or alleged non-compliance with any Environmental Law or any term or condition of any Environmental Permit.

"Environmental Permit" means any Permit, letter, clearance, consent, waiver, closure, exemption, decision or other action required under or issued, granted, given, authorized by or made pursuant to Environmental Law.

"Equipment Leases" means the finance leases or other Contracts providing for the lease and allowing for the purchase of the Leased Equipment by the Seller from the lessors set forth on Schedule 2.01(h).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

"ERISA Affiliate" means all employers (whether or not incorporated) that would be treated together with Seller or any of its Affiliates as a "single employer" within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"Escrow Agent" has the meaning set forth in Section 2.05.

"Exchange" has the meaning set forth in Section 6.15.

"Excluded Assets" has the meaning set forth in Section 2.02.

"Excluded Contracts" has the meaning set forth in Section 2.02(a).

"Excluded Liabilities" has the meaning set forth in Section 2.04.

"FIRPTA Certificate" has the meaning set forth in Section 7.02(m).

"Governmental Authority" means any federal, state, local or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or orders of such organization or authority have the force of Law), or any arbitrator, court or tribunal of competent jurisdiction.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Hazardous Materials" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation and polychlorinated biphenyls.

"Inspections" has the meaning set forth in Section 6.03(a).

"Insurance Policies" has the meaning set forth in Section 4.10.

"Intellectual Property" means any and all rights in, arising out of, or associated with any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("Patents"); (b) trademarks, service marks, brands, certification marks, logos, trade

4

dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("Trademarks"); (c) copyrights and works of authorship, whether or not copyrightable, and all registrations, applications for registration, and renewals of any of the foregoing ("Copyrights"); (d) internet domain names and social media account or user names (including "handles"), whether or not Trademarks, all associated web addresses, URLs, websites and web pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) mask works, and all registrations, applications for registration, and renewals thereof; (f) industrial designs, and all Patents, registrations, applications for registration, and renewals thereof; (g) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("Trade Secrets"); (h) computer programs, operating systems, applications, firmware and other code, including all source code, object code, application programming interfaces, data files, databases, protocols, specifications, and other documentation thereof ("Software"); (i) rights of publicity; and (j) all other intellectual or industrial property and proprietary rights.

"Intellectual Property Agreements" means all licenses, sublicenses, consent to use agreements, settlements, coexistence agreements, covenants not to sue, waivers, releases, permissions and other Contracts, whether written or oral, relating to any Intellectual Property that is used or held for use in the conduct of the Business as currently conducted or proposed to be conducted to which Seller is a party, beneficiary or otherwise bound.

"Intellectual Property Assets" means all Intellectual Property that is owned by Seller and used or held for use in the conduct of the Business as currently conducted or proposed to be conducted, together with all (i) royalties, fees, income, payments, and other proceeds now or hereafter due or payable to Seller with respect to such Intellectual Property; and (ii) claims and causes of action with respect to such Intellectual Property, including all rights to and claims for damages, restitution, and injunctive and other legal or equitable relief for infringement, misappropriation, or other violation thereof.

"Intellectual Property Assignments" has the meaning set forth in Section 3.02(a)(iii).

"Intellectual Property Registrations" means all Intellectual Property Assets that are subject to any issuance, registration, or application by or with any Governmental Authority or authorized private registrar in any jurisdiction, including issued Patents, registered Trademarks, domain names and Copyrights, and pending applications for any of the foregoing.

"Inventory" has the meaning set forth in Section 2.01(a).

"Knowledge of Seller" or "Seller's Knowledge" or any other similar knowledge qualification, means the actual or constructive knowledge of any director or officer of Seller or Seller's Affiliates, after due inquiry.

"Law" means any statute, law, ordinance, regulation, rule, code, order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Authority.

"Leased Equipment" has the meaning set forth in Section 2.01(h).

"Leased Real Property" has the meaning set forth in Section 4.08(b).

"Leases" has the meaning set forth in Section 4.08(b).

"Liabilities" means liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured or otherwise.

"Loan Financing" has the meaning set forth in Section 2.06.

"Material Adverse Effect" means any event, occurrence, fact, condition or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise) or assets of the Business, (b) the value of the Purchased Assets, or (c) the ability of Seller to consummate the transactions contemplated hereby on a timely basis.

"Owned Real Property" has the meaning set forth in Section 4.08(a).

"Patents" has the meaning set forth in the definition of Intellectual Property.

"Permits" means all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained, or required to be obtained, from Governmental Authorities.

"Permitted Encumbrances" has the meaning set forth in Section 4.06.

"Person" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association or other entity.

"Peterson Quarry Permit" means that certain Mining Permit No. 64112502 issued to the Seller by the Commonwealth of Pennsylvania Department of Environmental Protection, with an expiration date of October 23, 2032.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any taxable period beginning before and ending after the Closing Date, the portion of such taxable period ending on and including the Closing Date.

"Property Assets" has the meaning set forth in Section 6.04(a).

"Purchase Price" has the meaning set forth in Section 2.05.

"Purchased Assets" has the meaning set forth in Section 2.01.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Closing Certificate" has the meaning set forth in Section 7.03(g).

"Real Property" means, collectively, the Owned Real Property and the Leased Real Property.

"Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient or indoor air, surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants and other agents of such Person.

"Required Consents" has the meaning set forth in Section 2.09.

"Sale Motion" means the motion to be filed with the Bankruptcy Court by Seller seeking (a) approval of the terms and conditions of the Transaction Documents, and (b) authorization for the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Encumbrances.

"Sale Order" means the order of the Bankruptcy Court granting the relief requested in the Sale Motion and authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code and the assumption and assignment of the Purchased Assets that are executory contracts pursuant to Section 365 of the Bankruptcy Code, free and clear of all Encumbrances, claims and interests.

"Seller" has the meaning set forth in the preamble.

"Seller Closing Certificate" has the meaning set forth in Section 7.02(l).

"Software" has the meaning set forth in the definition of Intellectual Property.

"Specified Government Permits" means those certain Permits set forth on Schedule 7.02(i) hereto.

"Tangible Personal Property" has the meaning set forth in Section 2.01(d).

"Taxes" means all federal, state, local, foreign and other income, gross receipts, sales, use, production, ad valorem, transfer, documentary, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties or other taxes, fees, assessments or charges of any kind whatsoever, together with any interest, additions or penalties with respect thereto and any interest in respect of such additions or penalties.

"Tax Return" means any return, declaration, report, claim for refund, information return or statement or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Title Insurance Company" has the meaning set forth in Section 7.02(j).

"Trade Secrets" has the meaning set forth in the definition of Intellectual Property.

"Trademarks" has the meaning set forth in the definition of Intellectual Property.

## ARTICLE II
## PURCHASE AND SALE

**Section 2.01    Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, at the Closing, Seller shall sell, assign, transfer, convey and deliver to Purchaser, and Purchaser shall purchase from Seller, free and clear of any Encumbrances other than Permitted Encumbrances, pursuant to Sections 363 and 365 of the Bankruptcy Code, all of Seller's right, title and interest in, to and under all of the assets, properties and rights of every kind and nature, whether real, personal or mixed, tangible or intangible (including goodwill), wherever located and whether now existing or hereafter acquired, other than the Excluded Assets (collectively, the "Purchased Assets"), including, without limitation, the following:

(a)    all inventory, finished goods, raw materials, work in progress, packaging, supplies, parts and other inventories ("Inventory");

(b)    all Contracts set forth on Schedule 2.01(b) (collectively with any Equipment Leases that the Purchaser elects to assume in accordance with Section 2.01(i), the "Assigned Contracts");

(c)    all Intellectual Property Assets, including, for the avoidance of doubt, Seller's rights to the use of its name and any variations thereof;

7

(d)     all personal property, including all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property owned by Seller (the "Tangible Personal Property"), including but not limited to the vehicles and equipment set forth on Schedule 2.01(d);

(e)     the Leased Real Property included within the Assigned Contracts (the "Assumed Leased Real Property") and the Owned Real Property;

(f)     all Permits, including Environmental Permits, which are held by Seller and required for the conduct of the Business as currently conducted on the Owned Real Property or Assumed Leased Real Property, including, without limitation, those listed on Section 4.12(b) and Section 4.13(b) of the Disclosure Schedules, to the extent assignable pursuant to Sections 363 and 365 of the Bankruptcy Code;

(g)     solely to the extent Purchaser provides Seller with written notice prior to the Closing that Purchaser elects to include it in the Purchased Assets, the Peterson Quarry Permit;

(h)     solely to the extent Purchaser provides Seller with written notice prior to the Closing that Purchaser elects to include any or all of them in the Purchased Assets, those certain pieces of leased equipment set forth on Schedule 2.01(h) that are leased pursuant to an Equipment Lease (collectively, the "Leased Equipment");

(i)     solely to the extent Purchaser provides Seller with written notice prior to the Closing that Purchaser elects to include any or all of them in the Purchased Assets, the Equipment Leases;

(j)     all rights to any Actions of any nature available to or being pursued by Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

(k)     all prepaid expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (including any such item relating to the payment of Taxes);

(l)     all of Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

(m)     all insurance benefits, including rights and proceeds, arising from or relating to the Business, the Purchased Assets or the Assumed Liabilities;

(n)     originals, or where not available, copies, of all books and records, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authority), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research and files relating to the Intellectual Property Assets and the Intellectual Property Agreements ("Books and Records"); and

8

(o)    all goodwill and the going concern value of the Business.

**Section 2.02    Excluded Assets.** Notwithstanding the foregoing, the Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"):

(a)    Contracts that are not Assigned Contracts, unless otherwise agreed by the Parties in writing (the "Excluded Contracts");

(b)    all accounts or notes receivable held by Seller, and any security, claim, remedy or other right related to any of the foregoing;

(c)    the corporate seals, organizational documents, minute books, stock books, Tax Returns, books of account or other records having to do with the corporate organization of Seller; provided, that Seller shall furnish a copy of any of the foregoing to Purchaser upon Purchaser's request;

(d)    all cash and cash equivalents, bank accounts and securities of Seller;

(e)    all Benefit Plans and assets attributable thereto;

(f)    any Leased Real Property, other than the Assumed Leased Real Property;

(g)    any Permits other than (i) the Permits described in Section 2.01(f) and (ii) solely if Purchaser has provided written notice to the Seller pursuant to Section 2.01(g) prior to the Closing, the Peterson Quarry Permit;

(h)    any Leased Equipment that Purchaser has not elected to include in the Purchased Assets pursuant to written notice to the Seller prior to the Closing under Section 2.01(h);

(i)    any Equipment Leases that Purchaser has not elected to include in the Purchased Assets pursuant to written notice to the Seller prior to the Closing under Section 2.01(i); and

(j)    the rights that accrue or will accrue to Seller under this Agreement and the Ancillary Documents.

**Section 2.03    Assumed Liabilities.** Subject to the terms and conditions set forth herein, Purchaser shall assume and agree to pay, perform and discharge only the following Liabilities of Seller (collectively, the "Assumed Liabilities"), and no other Liabilities:

(a)    all Liabilities that first accrue and are to be performed from and after the Closing under the Assigned Contracts that relate to periods of time on or after the Closing; and

(b)    Liabilities relating to and arising from Purchaser's operation of the Purchased Assets after the Closing Date.

**Section 2.04    Excluded Liabilities.** Notwithstanding the provisions of Section 2.03 or any other provision in this Agreement to the contrary, Purchaser shall not assume and shall not be responsible to pay, perform or discharge any Liabilities of Seller or any of its Affiliates (or that may be asserted against or imposed upon Purchaser as a successor or transferee of Seller as an acquirer of the Purchased Assets as a matter of law) of any kind or nature whatsoever other than the Assumed Liabilities (the "Excluded Liabilities"). Seller shall, and shall cause each of its Affiliates to, pay and satisfy in due course all Excluded

9

Liabilities that they are obligated to pay and satisfy. Without limiting the generality of the foregoing, the Excluded Liabilities shall include, but not be limited to, the following:

(a)     any Liabilities of Seller arising or incurred in connection with the negotiation, preparation, investigation and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby, including, without limitation, fees and expenses of counsel, accountants, consultants, advisers and others;

(b)     any Liability of Seller or any of its Affiliates in respect of any Taxes;

(c)     any Liabilities relating to or arising out of the Excluded Assets;

(d)     any Liabilities that first accrued and were to be performed prior to the Closing under the Assigned Contracts or that otherwise relate to periods of time prior to the Closing (including but not limited to any Cure Costs (other than with respect to the Equipment Leases), which shall be satisfied by Seller at or prior to Closing);

(e)     any Liabilities in respect of any pending or threatened Action arising out of, relating to or otherwise in respect of the operation of the Business or the Purchased Assets to the extent such Action relates to such operation on or prior to the Closing Date;

(f)     any product Liability or similar claim for injury to a Person or property that arises out of or is based upon any express or implied representation, warranty, agreement or guaranty made by Seller, or by reason of the improper performance or malfunctioning of a product, improper design or manufacture, failure to adequately package, label or warn of hazards or other related product defects of any products at any time manufactured or sold or any service performed by Seller;

(g)     any recall, design defect or similar claims of any products manufactured or sold or any service performed by Seller;

(h)     any Liabilities of Seller arising under or in connection with any Benefit Plan providing benefits to any present or former employee of Seller;

(i)     any Liabilities of Seller for any present or former employees, officers, directors, retirees, independent contractors or consultants of Seller, including, without limitation, any Liabilities associated with any claims for wages or other benefits, bonuses, accrued vacation, workers' compensation, severance, retention, termination or other payments;

(j)     any Environmental Claims, or Liabilities under Environmental Laws, to the extent arising out of or relating to facts, circumstances or conditions existing on or prior to the Closing or otherwise to the extent arising out of any actions or omissions of Seller;

(k)     any trade accounts payable of Seller;

(l)     any Liabilities under the Excluded Contracts or any other Contracts (i) which are not validly and effectively assigned to Purchaser pursuant to this Agreement; (ii) which do not conform to the representations and warranties with respect thereto contained in this Agreement; or (iii) to the extent such Liabilities arise out of or relate to a breach by Seller of such Contracts prior to Closing;

10

(m)    any Liabilities associated with debt, loans or credit facilities of Seller and/or the Business owing to financial institutions or other third parties; and

(n)    any Liabilities arising out of, in respect of or in connection with the failure by Seller or any of its Affiliates to comply with any Law or Governmental Order.

**Section 2.05    Purchase Price.**  The aggregate purchase price for the Purchased Assets shall be One Million Nine Hundred Thousand Dollars ($1,900,000.00) (the "Purchase Price"), plus the assumption of the Assumed Liabilities. On the Effective Date, Purchaser is making payment of Twenty-Five Thousand Dollars ($25,000), as a good-faith deposit to the Purchase Price (the "Deposit") to Lori Bertsch-Brustman, Esq. of Lori Bertsch-Brustman PLLC, 4920 NY 52, Jeffersonville, NY ("Escrow Agent"), which Deposit shall be held by Escrow Agent pursuant to the provisions of Section 2.10. The remaining Purchase Price shall be paid as provided in Section 3.02. The Parties agree that in the event this Agreement is terminated, the Deposit shall be returned to Purchaser, unless the Agreement is terminated by Purchaser pursuant to Section 9.01(c)(i) or Seller pursuant to Section 9.01(d)(i).

**Section 2.06    Financing Contingency.**  The Parties expressly acknowledge and agree that Purchaser's obligations to pay the Purchase Price and otherwise consummate the transactions contemplated by this Agreement are conditioned on: (a) Purchaser's ability to obtain an unconditional binding written commitment for acquisition financing, whether by way of debt financing or otherwise, on terms acceptable to Purchaser in its sole and absolute discretion; and (b) the funding of such financing on or before the Closing Date (collectively, the "Loan Financing").

**Section 2.07    Allocation of Purchase Price.**  The Purchase Price shall be allocated among the Purchased Assets as set forth on Schedule 2.07, attached hereto and made a part hereof. Schedule 2.07 shall be prepared in accordance with Section 1060 of the Code. The Parties agree (a) to report the sale of the Purchased Assets for federal and state tax purposes in accordance with the allocations set forth in Schedule 2.07, and (b) not to take any position inconsistent with such allocations on any of their respective Tax Returns.

**Section 2.08    Withholding Tax.**  Purchaser shall be entitled to deduct and withhold from the Purchase Price all Taxes that Purchaser may be required to deduct and withhold under any provision of Tax Law. All such withheld amounts shall be treated as delivered to Seller hereunder.

**Section 2.09    Third Party Consents.**  Purchaser acknowledges that the Sale Order will authorize the assumption and assignment of the Assigned Contracts without the requirement of any consent by the parties thereto. To the extent any Assigned Contract is not assumable and assignable by Seller to Purchaser under Section 365 of the Bankruptcy Code without the consent of the applicable counterparty thereto, Seller and Purchaser shall use their commercially reasonable efforts (which shall not require Seller to pay any amounts for such consent) prior to Closing to obtain all such required consents of third parties which are necessary for the consummation of the transactions contemplated hereby (without conditions that are materially adverse to Purchaser) (the "Required Consents"). All such Required Consents shall be in writing and executed counterparts thereof shall be delivered to Purchaser on or before the Closing Date. If a Required Consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights thereunder so that Purchaser would not receive all such rights, Seller shall use its commercially reasonable efforts (which shall not require Seller to pay any amounts for such consent) after Closing to provide to Purchaser the benefits under any such Contract or any claim or right, including, without limitation, enforcement for the benefit of Purchaser of any and all rights of Seller against a third party thereto arising out of the default or cancellation by such third party or otherwise. Notwithstanding the foregoing, if Seller does not obtain a Required Consent, Purchaser shall not be required to assume (or deemed to have assumed) such Contract.

11

Section 2.10    Deposit. It is agreed that the Deposit shall deposited with Escrow Agent on the Effective Date, in a non-interest bearing account as part of the Purchase Price. The Deposit shall be held in escrow by Escrow Agent until the earliest to occur of: (a) the Closing; (b) the receipt by Escrow Agent of written notice from both Seller and Purchaser directing the return and/or delivery of the Deposit; (c) the receipt of notice from one Party directing the payment of the Deposit and the failure of the other Party to object within five (5) Business Days of service of a copy of such notice by Escrow Agent on such other Party; or (d) the receipt by Escrow Agent of a final non-appealable court order directing the payment of the Deposit. Notwithstanding the foregoing, in the event of a dispute between the Parties regarding the payment or return of the Deposit, Escrow Agent shall have the right, but not an obligation, to pay the Deposit into court and/or to commence an action or proceeding including, but not limited to, an action in interpleader, in order to obtain a judicial determination as to the Party legally entitled to receive the Deposit. The Parties agree that Escrow Agent shall not be held liable for any wrongful payment of the Deposit, except in the case of gross negligence or willful misfeasance. Escrow Agent shall not charge Purchaser, but may charge Seller, for her services hereunder, and Purchaser agrees that Escrow Agent shall not be precluded by reason of her acting as such Escrow Agent hereunder from representing Seller in connection with this Transaction including any legal proceedings or litigation arising therefrom.

## ARTICLE III
## CLOSING

Section 3.01    Closing. Subject to the terms and conditions of this Agreement, the consummation of the transactions contemplated by this Agreement (the "Closing") shall take place remotely by electronic exchange of documents and signatures no later than the fifth (5th) Business Day after all of the conditions to Closing set forth in ARTICLE VII are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as Seller and Purchaser may mutually agree upon in writing. The date on which the Closing is to occur is herein referred to as the "Closing Date". The Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date.

Section 3.02    Closing Deliverables.

(a)    At the Closing, Seller shall deliver to Purchaser the following:

(i)    a bill of sale in in form and substance satisfactory to Purchaser (the "Bill of Sale"), transferring the tangible personal property included in the Purchased Assets to Purchaser, duly executed by Seller;

(ii)    an assignment and assumption agreement in form and substance satisfactory to Purchaser (the "Assignment and Assumption Agreement"), effecting the assignment to and assumption by Purchaser of the Purchased Assets and the Assumed Liabilities, duly executed by Seller;

(iii)    an assignment in form and substance satisfactory to Purchaser (the "Intellectual Property Assignment"), transferring all of Seller's right, title and interest in and to the Intellectual Property Assets to Purchaser, duly executed by Seller;

(iv)    (A) with respect to each parcel of Owned Real Property, a Bargain and Sale Deed in form and substance satisfactory to Purchaser (each, a "Deed"), together with a Combined Real Estate Transfer Tax Return, Credit Line Mortgage Certificate and Certification of Exemption from the Payment of Estimated Personal Income Tax (TP-584), a Real Property Transfer Report (Form RP-5215), (B) an Owner/Seller Affidavit and any other documents required by the Title Insurance Company, each properly executed by

Seller, and (C) all keys and access codes to the Owned Real Properties and Assumed Leased Real Properties;

(v)    such documents, instruments or certificates reasonably required by the Title Insurance Company, in order for Purchaser to procure title insurance on the Owned Real Properties, duly executed by Seller;

(vi)    with respect to each Lease pertaining to an Assumed Leased Real Property, an Assignment and Assumption of Lease in form and substance satisfactory to Purchaser (each, an "Assignment and Assumption of Lease"), duly executed by Seller;

(vii)    a Consulting Agreement, in form and substance satisfactory to Purchaser (the "Consulting Agreement"), providing for Peter Johnston to provide consulting services with respect to the Business and the Purchased Assets to Purchaser for a period of up to one year following the Closing, duly executed by Peter Johnston;

(viii)    the Seller Closing Certificate;

(ix)    the FIRPTA Certificate;

(x)    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets;

(xi)    passwords or other unrestricted access to any websites, social media pages, google pages or other Intellectual Property Assets included within the Purchased Assets; and

(xii)    such other customary instruments of transfer, assumption, filings or documents, in form and substance reasonably satisfactory to Purchaser, as may be required to convey title in and ownership of the Purchased Assets or Owned Real Properties to Purchaser or otherwise to give effect to this Agreement.

(b)    At the Closing, Purchaser shall deliver to Seller the following:

(i)    the Purchase Price, less the Deposit, by wire transfer of immediately available funds to an account designated in writing by Seller to Purchaser, and as adjusted in accordance with Section 6.13 below;

(ii)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(iii)    with respect to each Lease pertaining to an Assumed Leased Real Property, an Assignment and Assumption of Lease, duly executed by Purchaser;

(iv)    the Consulting Agreement, duly executed by Purchaser; and

(v)    the Purchaser Closing Certificate.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLER

Except as set forth in the correspondingly numbered Section of the Disclosure Schedules, Seller represents and warrants to Purchaser that the statements contained in this <u>ARTICLE IV</u> are true and correct as of the Effective Date and as of the Closing Date.

**Section 4.01    Organization and Qualification of Seller.** Seller is a corporation duly organized, validly existing and in good standing under the Laws of the state of New York and has full corporate power and authority to own, operate or lease the properties and assets now owned, operated or leased by it and to carry on the Business as currently conducted. <u>Section 4.01</u> of the Disclosure Schedules sets forth each jurisdiction in which Seller is licensed or qualified to do business, and Seller is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the ownership of the Purchased Assets or the operation of the Business as currently conducted makes such licensing or qualification necessary.

**Section 4.02    Authority of Seller.** Seller has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Seller is or will be a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement and any Ancillary Document to which Seller is or will be a party, the performance by Seller of its obligations hereunder and thereunder and the consummation by Seller of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Seller. This Agreement has been duly executed and delivered by Seller, and (assuming due authorization, execution and delivery by Purchaser) this Agreement constitutes a legal, valid and binding obligation of Seller enforceable against Seller in accordance with its terms. When each Ancillary Document to which Seller is or will be a party has been duly executed and delivered by Seller (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Seller enforceable against it in accordance with its terms.

**Section 4.03    No Conflicts; Consents.** Subject to the order of the Bankruptcy Court, the execution, delivery and performance by Seller of this Agreement and the Ancillary Documents to which it is a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Seller; (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Seller, the Business or the Purchased Assets; (c) except as set forth in <u>Section 4.03</u> of the Disclosure Schedules, require the consent, notice or other action by any Person under, conflict with, result in a violation or breach of, constitute a default or an event that, with or without notice or lapse of time or both, would constitute a default under, result in the acceleration of or create in any party the right to accelerate, terminate, modify or cancel any Contract or Permit to which Seller is a party or by which Seller or the Business is bound or to which any of the Purchased Assets are subject (including any Assigned Contract); or (d) result in the creation or imposition of any Encumbrance other than Permitted Encumbrances on the Purchased Assets. Subject to the order of the Bankruptcy Court, no consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Seller in connection with the execution and delivery of this Agreement or any of the Ancillary Documents to which Seller is or will be a party and the consummation of the transactions contemplated hereby and thereby.

**Section 4.04    [Reserved].**

**Section 4.05    Assigned Contracts.** Except for the Assigned Contracts, Purchaser will not be bound by or subject to any other Contracts of Seller or its Affiliates associated with the Business as a result of the consummation of the transactions contemplated by this Agreement. Each Assigned Contract is valid and binding on Seller in accordance with its terms and is in full force and effect. Except as set forth on <u>Section 4.05</u> of the Disclosure Schedules, none of Seller or, to Seller's Knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under), or has provided or received any notice of any intention to terminate, any Assigned Contract. Except as set forth on <u>Section 4.05</u> of the

4854-1597-0263, v. 7

Docusign Envelope ID: DEF22D5Q-F0F6-4D30-825C-E85FBE789431

Disclosure Schedules, no event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration of other changes of any right or obligation or the loss of benefit thereunder. Complete and correct copies of each Assigned Contract have been made available to Purchaser. There are no disputes pending or threatened under any Assigned Contract.

**Section 4.06    Title to Purchased Assets.** Seller has good and valid title to, or a valid leasehold interest in, all of the Purchased Assets, and upon consummation of the transactions contemplated by this Agreement, Purchaser will acquire title to all of the Purchased Assets, free and clear of all Encumbrances. Subject to the entry of the Sale Order, at the Closing, Seller will have the right to transfer the Purchased Assets to Purchaser free and clear of all Encumbrances, other than Permitted Encumbrances. All such Purchased Assets (including leasehold interests) will be transferred to Purchaser at Closing free and clear of Encumbrances except for the following (collectively referred to as "Permitted Encumbrances"):

(a)    liens for Taxes not yet due and payable;

(b)    easements, rights of way, zoning ordinances and other similar encumbrances affecting Real Property which are not, individually or in the aggregate, material to the Business or the Purchased Assets, which do not prohibit or interfere with the current operation of any Real Property and which do not render title to any Real Property unmarketable.

**Section 4.07    Condition and Sufficiency of Assets.** The buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property included in the Purchased Assets are structurally sound, are in good operating condition and repair, and are adequate for the uses to which they have historically been put, and none of such buildings, plants, structures, furniture, fixtures, machinery, equipment, vehicles and other items of tangible personal property is in need of maintenance or repairs except for ordinary, routine maintenance and repairs that are not material in nature or cost. The Purchased Assets are sufficient for the conduct of the Business after the Closing in substantially the same manner as historically conducted prior to the Closing and constitute all of the rights, property and assets necessary to conduct the Business as currently conducted. None of the Excluded Assets are material to the Business.

**Section 4.08    Real Property.**

(a)    Section 4.08(a) of the Disclosure Schedules sets forth each parcel of real property owned by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "Owned Real Property"), including with respect to each property, the address location and use. Seller has delivered to Purchaser copies of the deeds and other instruments (as recorded) by which Seller acquired such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Seller with respect to such parcel. With respect to each parcel of Real Property:

(i)    Seller has good and marketable fee simple title, free and clear of all Encumbrances, except (A) Permitted Encumbrances and (B) those Encumbrances set forth on Section 4.08(a) of the Disclosure Schedules;

(ii)    Seller has not leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

15

(iii)     there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)     Section 4.08(b) of the Disclosure Schedules sets forth each parcel of real property leased by Seller and used in or necessary for the conduct of the Business as currently conducted (together with all rights, title and interest of Seller in and to leasehold improvements relating thereto, including, but not limited to, security deposits, reserves or prepaid rents paid in connection therewith, collectively, the "Leased Real Property"), and a true and complete list of all leases, subleases, licenses, concessions and other agreements (whether written or oral), including all amendments, extensions renewals, guaranties and other agreements with respect thereto, pursuant to which Seller holds any Leased Real Property (collectively, the "Leases"). Seller has delivered to Purchaser a true and complete copy of each Lease. With respect to each Lease:

(i)     such Lease is valid, binding, enforceable and in full force and effect, and Seller enjoys peaceful and undisturbed possession of the Leased Real Property;

(ii)     Seller is not in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default, and Seller has paid all rent due and payable under such Lease;

(iii)     Seller has not received nor given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by Seller under any of the Leases and, to the Knowledge of Seller, no other party is in default thereof, and no party to any Lease has exercised any termination rights with respect thereto;

(iv)     Seller has not subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Real Property or any portion thereof; and

(v)     Seller has not pledged, mortgaged or otherwise granted an Encumbrance on its leasehold interest in any Leased Real Property.

(c)     Seller has not received any written notice of (i) material violations of building codes and/or zoning ordinances or other governmental or regulatory Laws affecting the Real Property, (ii) existing, pending or threatened condemnation proceedings affecting the Real Property, or (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could reasonably be expected to materially and adversely affect the ability to operate the Real Property as currently operated. Neither the whole nor any material portion of any Real Property has been damaged or destroyed by fire or other casualty.

(d)     The Real Property is sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing and constitutes all of the real property necessary to conduct the Business as currently conducted.

**Section 4.09     Intellectual Property.**

(a)     Section 4.09(a) of the Disclosure Schedules contains a correct, current and complete list of: (i) all Intellectual Property Registrations; and (ii) all unregistered Trademarks included in the Intellectual Property Assets.

16

(b)    Seller is the sole and exclusive legal and beneficial, and with respect to the Intellectual Property Registrations, record, owner of all right, title and interest in and to the Intellectual Property Assets, and has the valid and enforceable right to use all other Intellectual Property used in or necessary for the conduct of the Business as currently conducted, in each case, free and clear of Encumbrances other than Permitted Encumbrances. The Intellectual Property Assets are all of the Intellectual Property necessary to operate the Business as presently conducted.

(c)    Immediately following the Closing, all Intellectual Property Assets will be owned or available for use by Purchaser on identical terms as they were owned or available for use by Seller immediately prior to the Closing.

**Section 4.10    Insurance.**  Section 4.10 of the Disclosure Schedules sets forth (a) a true and complete list of all current policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance maintained by Seller or its Affiliates relating to the Business, the Purchased Assets or the Assumed Liabilities (collectively, the "Insurance Policies"). All the Insurance Policies (a) are in full force and effect and enforceable in accordance with their terms; (b) are provided by carriers who are financially solvent; and (c) have not been subject to any lapse in coverage. None of Seller or any of its Affiliates is in default under, or has otherwise failed to comply with, in any material respect, any provision contained in any Insurance Policy. The Insurance Policies are of the type and in the amounts customarily carried by Persons conducting a business similar to the Business and are sufficient for compliance with all applicable Laws and Contracts to which Seller is a party or by which it is bound. True and complete copies of the Insurance Policies have been made available to Purchaser.

**Section 4.11    Legal Proceedings; Governmental Orders.**

(a)    Except for the Bankruptcy Case or as set forth in Section 4.11(a) of the Disclosure Schedules, there are no Actions pending or, to Seller's Knowledge, threatened against or by Seller (a) relating to or affecting the Business, the Purchased Assets or the Assumed Liabilities; or (b) that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

(b)    Except for the Bid Procedures Order or as set forth in Section 4.11(b) of the Disclosure Schedules, there are no outstanding Governmental Orders and no unsatisfied judgments, penalties or awards against, relating to or affecting the Business. Seller is in compliance with the terms of each Governmental Order set forth in Section 4.11(b) of the Disclosure Schedules. No event has occurred or circumstances exist that may constitute or result in (with or without notice or lapse of time) a violation of any such Governmental Order.

**Section 4.12    Compliance With Laws; Permits.**

(a)    Seller is and has been in compliance in all material respects with all Laws applicable to the conduct of the Business as currently conducted or the ownership and use of the Purchased Assets.

(b)    All Permits required for Seller to conduct the Business as currently conducted or for the ownership and use of the Purchased Assets have been obtained by Seller and are valid and in full force and effect. All fees and charges with respect to such Permits as of the date hereof have been paid in full. Section 4.12(b) of the Disclosure Schedules lists all current Permits issued to Seller which are related to the conduct of the Business as currently conducted or the ownership and

17

use of the Purchased Assets, including the names of the Permits and their respective dates of issuance and expiration. Seller has complied and is now complying with the terms of all Permits listed on Section 4.12(b) of the Disclosure Schedules. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse or limitation of any Permit set forth in Section 4.12(b) of the Disclosure Schedules.

**Section 4.13    Environmental Matters.**

(a)    The operations of Seller with respect to the Business and the Purchased Assets are currently and have been in compliance with all Environmental Laws in all material respects. Seller has not received from any Person, with respect to the Business or the Purchased Assets, any: (i) Environmental Notice or Environmental Claim; or (ii) written request for information pursuant to Environmental Law, which, in each case, either remains pending or unresolved, or is the source of ongoing obligations or requirements as of the Closing Date.

(b)    Seller has obtained and is in material compliance with all Environmental Permits (each of which is disclosed in Section 4.13(b) of the Disclosure Schedules) necessary for the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets and all such Environmental Permits are in full force and effect and shall be maintained in full force and effect by Seller through the Closing Date in accordance with Environmental Law, and Seller is not aware of any condition, event or circumstance that might prevent or impede, after the Closing Date, the conduct of the Business as currently conducted or the ownership, lease, operation or use of the Purchased Assets. With respect to any such Environmental Permits, Seller has undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of the same, and Seller is not aware of any condition, event or circumstance that might prevent or impede the transferability of the same, and has not received any Environmental Notice or written communication regarding any material adverse change in the status or terms and conditions of the same.

**Section 4.14    Taxes.** Except as set forth in Section 4.14 of the Disclosure Schedules:

(a)    All Tax Returns required to be filed by Seller for any Pre-Closing Tax Period have been, or will be, timely filed. Such Tax Returns are, or will be, true, complete and correct in all respects. All Taxes due and owing by Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)    Seller has withheld and paid each Tax required to have been withheld and paid in connection with amounts paid or owing to any Employee, independent contractor, creditor, customer, shareholder or other party, and complied with all information reporting and backup withholding provisions of applicable Law.

(c)    No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of Seller.

(d)    All deficiencies asserted, or assessments made, against Seller as a result of any examinations by any taxing authority have been fully paid.

(e)    Seller is not a party to any Action by any taxing authority. There are no pending or threatened Actions by any taxing authority.

(f)    There are no Encumbrances for Taxes upon any of the Purchased Assets nor, to Seller's Knowledge, is any taxing authority in the process of imposing any Encumbrances for Taxes

18

on any of the Purchased Assets (other than for current Taxes not yet due and payable), other than Encumbrances that will be released as of Closing pursuant to the Sale Order.

(g)     Seller is not a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section 4.15    Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Seller.

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Seller that the statements contained in this <u>ARTICLE V</u> are true and correct as of the Effective Date and as of the Closing Date.

**Section 5.01    Organization of Purchaser.**  Purchaser is a corporation duly organized, validly existing and in good standing under the Laws of the State of New York.

**Section 5.02    Authority of Purchaser.**  Purchaser has full corporate power and authority to enter into this Agreement and the Ancillary Documents to which Purchaser is or will be a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Purchaser of this Agreement and any Ancillary Document to which Purchaser is or will be a party, the performance by Purchaser of its obligations hereunder and thereunder and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all requisite corporate action on the part of Purchaser. This Agreement has been duly executed and delivered by Purchaser, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms. When each Ancillary Document to which Purchaser is or will be a party has been duly executed and delivered by Purchaser (assuming due authorization, execution and delivery by each other party thereto), such Ancillary Document will constitute a legal and binding obligation of Purchaser enforceable against it in accordance with its terms.

**Section 5.03    No Conflicts; Consents.**  The execution, delivery and performance by Purchaser of this Agreement and the Ancillary Documents to which it is or will be a party, and the consummation of the transactions contemplated hereby and thereby, do not and will not: (a) conflict with or result in a violation or breach of, or default under, any provision of the certificate of incorporation, by-laws or other organizational documents of Purchaser; or (b) conflict with or result in a violation or breach of any provision of any Law or Governmental Order applicable to Purchaser. No consent, approval, Permit, Governmental Order, declaration or filing with, or notice to, any Governmental Authority is required by or with respect to Purchaser in connection with the execution and delivery of this Agreement and the Ancillary Documents to which Purchaser is or will be a party and the consummation of the transactions contemplated hereby and thereby.

**Section 5.04    Brokers.**  No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement or any Ancillary Document based upon arrangements made by or on behalf of Purchaser.

**Section 5.05    Sufficiency of Funds.**  Subject to the Loan Financing, Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

19

**Section 5.06    Legal Proceedings.**  There are no Actions pending or, to Purchaser's knowledge, threatened against or by Purchaser or any Affiliate of Purchaser that challenge or seek to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**ARTICLE VI**
**COVENANTS**

**Section 6.01    Bankruptcy Sale Order.**

(a)      Following the Effective Date, Seller shall use its reasonable best efforts to obtain entry of an order of the Bankruptcy Court approving the Transaction on the terms of this Agreement. The Sale Order shall be in a form reasonably satisfactory to Purchaser and shall, among other things:

(i)      approve and direct the sale and assignment of the Purchased Assets to Purchaser and approve and direct the assumption and assignment of the Assigned Contracts to Purchaser free and clear of all Encumbrances, claims or interests, based on appropriate findings and rulings pursuant to, inter alia, Sections 363(b), (f) and (m) and 365 of the Bankruptcy Code, including but not limited to Sections 365(h), (i), (l) and (n) and the release of Purchaser of any rights otherwise associated with, and which may otherwise be to the benefit of, any third parties;

(ii)      include a finding that Purchaser is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code;

(iii)      include a finding that Purchaser is not deemed to be a successor to Seller, to have, *de facto* or otherwise, merged with or into Seller or to be a mere continuation of Seller;

(iv)      include a finding that the Purchase Price is a fair and reasonable price for the Purchased Assets;

(v)      include a finding confirming that the adequacy of notice to all creditors and parties in interest and parties to any executory contract, unexpired lease or right of entry; and

(vi)      include provisions for the retention of jurisdiction in the Bankruptcy Court over matters relating to the transactions contemplated in this Agreement including matters relating to title to the Purchased Assets and claims against the Purchased Assets which arose or were based on facts or occurrences prior to the Closing.

(b)      Seller shall provide notice of any hearing on the motion to approve the Sale Order or any other matter before the Bankruptcy Court relating to this Agreement or the Transaction Documents, in each case as required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Southern District of New York or as otherwise ordered by the Bankruptcy Court.

**Section 6.02    Certain Bankruptcy Undertakings by Seller.**

20

Docusign Envelope ID: DF533CBC-FDB6-4D30-B250-E25FBE380AB5

(a)     Following the Effective Date, Seller shall file the Sale Motion. Except as ordered by the Bankruptcy Court, Seller shall neither take any actions, nor fail to take any action, which action or failure to act would reasonably be expected to (i) prevent or impede the consummation of the transactions contemplated by this Agreement in accordance with the terms of this Agreement; or (ii) result in (A) the reversal, avoidance, revocation, vacating or modification (in any manner that would reasonably be expected to materially and adversely affect Purchaser's rights hereunder), or (B) the entry of a stay pending appeal.

(b)     If the Sale Procedures Order, the Sale Order or any other order of the Bankruptcy Court relating to this Agreement shall be appealed by any Person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), Seller, with the cooperation and support of Purchaser, shall take all steps as may be reasonable and appropriate to defend against such appeal, petition or motion, and shall endeavor to obtain an expedited resolution of such appeal.

**Section 6.03    Due Diligence.**

(a)     Subject to the last sentence of this Section 6.03(a), for a period of sixty (60) days following the Effective Date (the "Due Diligence Period"), Purchaser shall have the right to conduct due diligence on the Business and the Purchased Assets, including to conduct or cause to be conducted any and all tests, studies, surveys, inspections, reviews, assessments or evaluations of the Real Property, including without limitation engineering, topographic, soils, zoning, wetlands and environmental inspections (including Phase I and/or Phase II environmental assessments to be performed by an environmental consultant selected by Purchaser) and the procurement of a title commitment from the Title Insurance Company (the "Inspections"), as Purchaser deems necessary, desirable or appropriate in its sole and absolute discretion, and analysis of due diligence materials provided by Seller (including the Assigned Contracts and Permits). Purchaser shall have the right, for any reason or no reason whatsoever, to terminate this Agreement upon written notice to Seller delivered at any time prior to 5:00 p.m. Eastern Time on the last day of the Due Diligence Period. If Purchaser does not timely notify Seller of its election to terminate this Agreement prior to 5:00 p.m. Eastern Time on the last day of the Due Diligence Period, Purchaser shall be deemed to have elected to proceed to Closing, subject to the terms and conditions of this Agreement (including the other termination rights set forth in Article IX). If Purchaser elects to terminate this Agreement pursuant to this Section 6.03, Seller shall be entitled to retain the Deposit and this Agreement shall terminate, and the Parties shall have no further liability hereunder (except with respect to those obligations hereunder that expressly survive the termination of this Agreement). Notwithstanding the foregoing, so long as Purchaser is making good-faith efforts to conduct the Inspections, Purchaser may elect to extend the Due Diligence Period for an additional thirty (30) days by providing written notice of such election to Seller prior to the expiration of the Due Diligence Period (in which case the "Due Diligence Period" shall expire upon the expiration of such additional thirty (30) day period).

(b)     At any time prior to Closing (including during the Due Diligence Period), Purchaser and Representatives (including its inspectors, appraisers, engineers and contractors) shall have the right to enter upon and pass through the real property constituting the Owned Real Property or Assumed Leased Real Property during normal business hours to examine and inspect the same, as well as conduct reasonable tests, studies, investigations and surveys to assess the utility availability, soil conditions, mineral reserves, environmental conditions, physical conditions and the like of such Owned Real Property or Assumed Leased Real Property.

(c)     In conducting the Inspections or otherwise accessing the Owned Real Property or Assumed Leased Real Property, Purchaser shall at all times comply with all applicable Laws and

regulations. In connection with such Inspections, neither Purchaser nor Purchaser's Representatives shall: (i) unreasonably interfere with or permit unreasonable interference with any Person occupying or providing service at such property; or (ii) unreasonably disturb the use or occupancy of any occupant of such property. Purchaser shall schedule and coordinate all Inspections with Seller and shall give Seller at least one (1) Business Day's prior notice thereof. Seller shall be entitled to have a representative present at all times during each such inspection or other access. Seller shall allow Purchaser's Representatives unlimited access to the Owned Real Property and the Assumed Leased Real Property and to other information pertaining thereto or to any other Purchased Asset in the possession or within the control of Seller for the purpose of the Inspections.

**Section 6.04    Risk of Loss; Casualty and Condemnation.**    Risk of loss as to the Purchased Assets shall remain with the Seller until Closing.

(a)    From the Effective Date until the earlier of the termination of this Agreement pursuant to Section 9.01 or the Closing Date, Seller shall maintain in full force and effect insurance covering the Owned Real Property and the personal property located at the Owned Real Property ("Property Assets") for fire and extended perils.  In the event of a casualty loss occurring to any of the Property Assets ("Casualty") after the date of this Agreement that constitutes a Material Adverse Effect, Purchaser shall have the right to either take the proceeds from such insurance and complete the Transaction, or to terminate this Agreement and have the Deposit returned.  In the event of a Casualty after the date of this Agreement that does not constitute a Material Adverse Effect, Seller shall not be obligated to repair or restore the Property Assets; provided,  Seller shall pay the deductible under the applicable insurance policy and shall assign to Purchaser the proceeds from such insurance, whereupon the Transaction shall be consummated.  If a Casualty occurs that constitutes a Material Adverse Effect and Purchaser elects to take proceeds from such insurance and complete the Transaction, Seller shall use commercially reasonable efforts to do all things, at its own expense, as may be necessary, including the obtaining of relevant mortgagees' releases, in order to ensure prompt payment of the proceeds of such insurance by the insurer to Purchaser; provided,  Seller shall not be obligated to repair or restore the Property Assets; provided, further, Seller shall pay any applicable deductible under the insurance policy(ies) or the amount thereof shall be deducted from the payment of the Purchase Price at the Closing.  In the event of a Casualty occurrence prior to the Closing Date, the Closing Date shall be postponed until the loss is adjusted and the estimate for repair, replacement or restoration has been approved by the insurance company.  Upon written receipt of the loss adjustment (this term shall be deemed a written statement from the insurance company of the total amount of loss as determined by the insurance company, and the amount that the insurance company shall pay) and approved estimate by the insurance company, the Closing shall be reset for a date no later than ten (10) Business Days thereafter, whether or not the repair, replacement or restoration has been completed.  Notwithstanding the foregoing, if the loss adjustment and approved estimate by the insurance company have not been received within forty five (45) Business Days from the date of casualty, unless Purchaser agrees to extend the Closing Date, Purchaser shall have the option to terminate this Agreement and have the Deposit returned with interest as herein provided.

(b)    If, at any time after the Effective Date and prior to or on the Closing Date, all or any part of the Owned Real Property shall be taken, or threatened to be taken, in the exercise of the power of eminent domain by any sovereign, Seller immediately shall notify Purchaser of such taking and provide Purchaser with copies of all documents received by Seller and relevant thereto.  If within ten (10) Business Days after receiving written notice from Seller of such taking, Purchaser shall notify Sellers of Purchaser's election to terminate this Agreement, the Deposit shall be returned to Purchaser.  If Purchaser shall fail, within ten (10) Business Days of receiving Seller's notice, to notify Seller of Purchaser's election to terminate this Agreement, this Agreement shall

22

remain in full force and effect, without reduction in Purchase Price, and at the Closing, Seller shall transfer and/or assign to Purchaser any and all monies and claims relating to such taking; provided, that notwithstanding any other provision of this Agreement, Purchaser shall not be entitled to terminate the Agreement unless the condemnation/taking constitutes a Material Adverse Effect.

**Section 6.05    Conduct of Business Prior to the Closing.**  From the date hereof until the Closing, except as otherwise provided in this Agreement or consented to in writing by Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), Seller shall use reasonable best efforts to maintain and preserve intact its current Business organization and to preserve the rights, franchises, goodwill and relationships of its customers, lenders, suppliers, regulators and others having relationships with the Business. Without limiting the foregoing, from the date hereof until the Closing Date, Seller shall:

(a)    preserve and maintain all Permits required for the conduct of the Business as currently or historically conducted or the ownership and use of the Purchased Assets;

(b)    subject to the approval of the Bankruptcy Court, pay the debts, Taxes and other obligations of the Business when due;

(c)    maintain the properties and assets included in the Purchased Assets in the same condition as they were on the date of this Agreement, subject to reasonable wear and tear;

(d)    continue in full force and effect without modification all Insurance Policies, except as required by applicable Law;

(e)    defend and protect the properties and assets included in the Purchased Assets from infringement or usurpation;

(f)    perform all of its obligations under all Assigned Contracts (other than the Equipment Leases);

(g)    maintain the Books and Records in accordance with past practice; and

(h)    comply in all material respects with all Laws applicable to the conduct of the Business or the ownership and use of the Purchased Assets.

**Section 6.06    Access to Information.**  From the date hereof until the Closing, Seller shall (a) afford Purchaser and its Representatives full and free access to and the right to inspect all of the Real Property, properties, assets, premises, Books and Records, Contracts and other documents and data related to the Business; (b) furnish Purchaser and its Representatives with such financial, operating and other data and information related to the Business as Purchaser or any of its Representatives may reasonably request; and (c) instruct the Representatives of Seller to cooperate with Purchaser in its investigation of the Business. Any investigation pursuant to this Section 6.06 shall be conducted in such manner as not to interfere unreasonably with the conduct of the Business or any other businesses of Seller. No investigation by Purchaser or other information received by Purchaser shall operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement.

**Section 6.07    Notice of Certain Events.**

(a)    From the date hereof until the Closing, Seller shall promptly notify Purchaser in writing of:

23

4854-1597-0263, v. 7

(i)    any fact, circumstance, event or action the existence, occurrence or taking of which (A) has had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, (B) has resulted in, or could reasonably be expected to result in, any representation or warranty made by Seller hereunder not being true and correct or (C) has resulted in, or could reasonably be expected to result in, the failure of any of the conditions set forth in Section 7.02 to be satisfied;

(ii)    any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the transactions contemplated by this Agreement;

(iii)    any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; and

(iv)    any Actions commenced or, to Seller's Knowledge, threatened against, relating to or involving or otherwise affecting the Business, the Purchased Assets or the Assumed Liabilities that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 4.11 or that relates to the consummation of the transactions contemplated by this Agreement.

(b)    Purchaser's receipt of information pursuant to this Section 6.07 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Seller in this Agreement and shall not be deemed to amend or supplement the Disclosure Schedules.

**Section 6.08    Confidentiality.** From and after the Closing, Seller shall, and shall cause its Affiliates to, hold, and shall use its reasonable best efforts to cause its or their respective Representatives to hold, in confidence any and all information, whether written or oral, concerning the Business, except to the extent that Seller can show that such information (a) is generally available to and known by the public through no fault of Seller, any of its Affiliates or their respective Representatives; or (b) is lawfully acquired by Seller, any of its Affiliates or their respective Representatives from and after the Closing from sources which are not prohibited from disclosing such information by a legal, contractual or fiduciary obligation. If Seller or any of its Affiliates or their respective Representatives are compelled to disclose any information by judicial or administrative process or by other requirements of Law, Seller shall promptly notify Purchaser in writing and shall disclose only that portion of such information which Seller is advised by its counsel in writing is legally required to be disclosed; provided, that Seller shall use reasonable best efforts to obtain an appropriate protective order or other reasonable assurance that confidential treatment will be accorded such information.

**Section 6.09    Governmental Approvals and Consents.**

(a)    Each Party shall, as promptly as possible, (i) make, or cause be be made, all filings and submissions required under any Law applicable to such Party or any of its Affiliates; and (ii) use reasonable best efforts to obtain, or cause to be obtained, all consents, authorizations, orders and approvals from all Governmental Authorities that may be or become necessary for its execution and delivery of this Agreement and the performance of its obligations pursuant to this Agreement and the Ancillary Documents. Each Party shall cooperate fully with the other Party and its Affiliates in promptly seeking to obtain all such consents, authorizations, orders and approvals. The Parties shall not willfully take any action that will have the effect of delaying, impairing or impeding the receipt of any required consents, authorizations, orders and approvals.

(b)      Seller and Purchaser shall use reasonable best efforts to give all notices to, and obtain all consents from, all third parties that are described in <u>Section 4.03</u> of the Disclosure Schedules.

(c)      Without limiting the generality of the Parties' undertakings pursuant to subsections (a) and (b) above, each of the Parties shall use all reasonable best efforts to:

(i)      respond to any inquiries by any Governmental Authority regarding antitrust or other matters with respect to the transactions contemplated by this Agreement or any Ancillary Document;

(ii)      avoid the imposition of any order or the taking of any action that would restrain, alter or enjoin the transactions contemplated by this Agreement or any Ancillary Document; and

(iii)      in the event any Governmental Order adversely affecting the ability of the Parties to consummate the transactions contemplated by this Agreement or any Ancillary Document has been issued, to have such Governmental Order vacated or lifted.

**Section 6.10    Closing Conditions.** From the date hereof until the Closing, each Party shall use reasonable best efforts to take such actions as are necessary to expeditiously satisfy the closing conditions set forth in <u>ARTICLE VII</u> hereof.

**Section 6.11    Public Announcements.** Unless otherwise required by applicable Law (based upon the reasonable advice of counsel), no Party shall make any public announcements in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other Party (which consent shall not be unreasonably withheld, conditioned or delayed), and the Parties shall cooperate as to the timing and contents of any such announcement.

**Section 6.12    Transfer Taxes.** All transfer, documentary, sales, use, stamp, registration, value added and other such Taxes and fees (including any penalties and interest) incurred in connection with this Agreement and the Ancillary Documents (including any real property transfer Tax and any other similar Tax) shall be borne and paid by Seller when due. Seller shall, at its own expense, timely file any Tax Return or other document with respect to such Taxes or fees (and Purchaser shall cooperate with respect thereto as necessary) or the Parties may mutually agree that Purchaser shall defray such Taxes and deduct the amount therefrom from the Purchase Price at the Closing.

**Section 6.13    Property Taxes and Other Adjustments.** The amounts of all Taxes and other assessments, water, sewer and utility (including fuel, electricity and telecommunications) bills, insurance premiums, and all other operating expenses, and rents (including security deposits and all additional rents and lease payment obligations) relating to the Owned Real Property and Assumed Leased Real Property shall be apportioned between Seller, on the one hand, and Purchaser, on the other hand, so that Seller shall responsible for all of the foregoing up to and including the Closing Date and Purchaser shall be responsible for the same after the Closing Date; <u>provided</u>, that such adjustments shall only apply to utility services and other operating expenses and insurance coverages of Seller that Purchaser elects to assume as of the Closing, and Seller shall pay and discharge prior to or at Closing all such expenses not so assumed by Purchaser.

**Section 6.14    Seller Name and Logo.** The Parties acknowledge that the Seller's name and logo are included within the Purchased Assets that Purchaser is acquiring at Closing. Promptly following completion of the current proceedings with the Bankruptcy Court, Seller will either (a) liquidate and

dissolve in accordance with the Laws of its jurisdiction of formation, or (b) amend its organizational documents and make any necessary filings with Governmental Authorities, and take any other actions necessary, to change Seller's name to a name sufficiently dissimilar to Seller's current name as to avoid confusion (including omission of "Johnston", "Rhodes" and/or "Bluestone").

Section 6.15    1031 Exchange.  If Purchaser notifies Seller prior to the Closing that Purchaser desires to attempt to effectuate a "tax-free" or so-called "like-kind" exchange pursuant to Section 1031 of the Code in connection with the purchase of some or all of the Owned Real Property (an "Exchange"), Seller agrees to cooperate with Purchaser, at no cost, expense or liability to Seller, in Purchaser's attempt to effectuate such Exchange; provided, that Seller makes no representations to Purchaser that any such Exchange shall be treated as "tax-free" by the Internal Revenue Service. Purchaser agrees to indemnify Seller from all liability arising out of or resulting from any action that Purchaser requests Seller to take pursuant to this Section 6.15, and to reimburse Seller for all reasonable fees, costs, and expenses approved by the Purchaser in advance and directly incurred by Seller as a result of Purchaser's election to effectuate an Exchange. The Seller shall not be required to hold title to any real estate or other assets in order to cooperate with the Exchange. Without limiting Purchaser's rights pursuant to Section 10.07, Purchaser may assign its rights to this Agreement to a third party (a Qualified Intermediary or Exchange Accommodator Titleholder) for purposes of effectuating an Exchange and Seller hereby consents to such assignment; provided, that such assignment shall not (a) constitute an assumption by the Qualified Intermediary or Exchange Accommodator Titleholder of Purchaser's obligations hereunder, (b) release Purchaser of any of its obligations hereunder, (c) diminish or affect the rights of Seller or Purchaser hereunder, or (d) materially delay the Closing. Seller shall execute such documents and take such other action as may reasonably be requested for the purpose of so qualifying the transaction contemplated by this Agreement as an Exchange.

Section 6.16    Further Assurances.  Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the Ancillary Documents.

## ARTICLE VII
## CONDITIONS TO CLOSING

Section 7.01    Conditions to Obligations of All Parties.  The obligations of each Party to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)      No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Governmental Order which is in effect and has the effect of making the transactions contemplated by this Agreement illegal, otherwise restraining or prohibiting consummation of such transactions or causing any of the transactions contemplated hereunder to be rescinded following completion thereof.

(b)      Seller shall have received all consents, authorizations, orders and approvals from the Governmental Authorities referred to in Section 4.03, in form and substance reasonably satisfactory to Purchaser, and no such consent, authorization, order and approval shall have been revoked.

Section 7.02    Conditions to Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Purchaser's waiver, at or prior to the Closing, of each of the following conditions:

4854-1597-0263, v. 7

(a)     Other than the representations and warranties of Seller contained in <u>Section 4.01</u>, <u>Section 4.02</u>, <u>Section 4.03</u> and <u>Section 4.15</u>, the representations and warranties of Seller contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (without giving effect to any limitation indicated by the words "Material Adverse Effect," "in all material respects," "in any material respect," "material," or "materially") on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects), except where the failure of such representations and warranties to be so true and correct would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect. The representations and warranties of Seller contained in <u>Section 4.01</u>, <u>Section 4.02</u>, <u>Section 4.03</u> and <u>Section 4.15</u> shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

(b)     Seller shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)     The Sale Order shall have been entered by the Bankruptcy Court and either (i) the Sale Order shall contain a waiver of the 14-day stay contemplated by Rule 6004(h) of the Federal Rules of Bankruptcy Procedures, or (ii) the Sale Order shall have become final and non-appealable. All such orders must be in effect and must not have been reversed or stayed or modified in any material respect.

(d)     The Loan Financing shall have occurred.

(e)     No Action shall have been commenced against Purchaser or Seller, which would prevent the Closing. No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any transaction contemplated hereby.

(f)     All approvals, consents and waivers that are listed on <u>Section 4.03</u> of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Purchaser at or prior to the Closing.

(g)     From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event or events have occurred that, individually or in the aggregate, with or without the lapse of time, could reasonably be expected to result in a Material Adverse Effect.

(h)     Seller shall have delivered to Purchaser duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in <u>Section 3.02(a)</u>.

(i)     Purchaser shall have received all Permits (or obtained any required consents for the assignment to Purchaser of Permits held by Seller, including the Specified Governmental Permits) that are necessary for it to conduct the Business as conducted by Seller.

(j)     Purchaser shall have received (at Purchaser's expense) an owner's title insurance policy with respect to each parcel of Owned Real Property, issued by a nationally recognized title insurance company acceptable to Purchaser (the "<u>Title Insurance Company</u>"), written as of the

27

Closing Date, insuring Purchaser in such amounts and together with such endorsements, and otherwise in such form, as Purchaser shall require. Such title insurance policy shall insure fee simple title to each Owned Real Property, free and clear of all Encumbrances other than Permitted Encumbrances and those listed on Section 4.08(a) of the Disclosure Schedules.

(k)      All Encumbrances relating to the Purchased Assets shall have been released in full, other than Permitted Encumbrances and Encumbrances that will be released upon the sale, and Seller shall have delivered to Purchaser written evidence, in form satisfactory to Purchaser in its sole discretion, of the release of such Encumbrances.

(l)      Purchaser shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Seller, that each of the conditions set forth in Section 7.02(a) and Section 7.02(b) have been satisfied (the "Seller Closing Certificate").

(m)      Purchaser shall have received a certificate pursuant to Treasury Regulations Section 1.1445-2(b) (the "FIRPTA Certificate") that Seller is not a foreign person within the meaning of Section 1445 of the Code duly executed by Seller.

(n)      Seller shall have delivered to Purchaser such other documents or instruments as Purchaser reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 7.03    Conditions to Obligations of Seller.** The obligations of Seller to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment or Seller's waiver, at or prior to the Closing, of each of the following conditions:

(a)      Other than the representations and warranties of Purchaser contained in Section 5.01, Section 5.02, Section 5.03 and Section 5.04, the representations and warranties of Purchaser contained in this Agreement, the Ancillary Documents and any certificate or other writing delivered pursuant hereto shall be true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or material adverse effect) on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects). The representations and warranties of Purchaser contained in Section 5.01, Section 5.02, Section 5.03 and Section 5.04 shall be true and correct in all respects on and as of the date hereof and on and as of the Closing Date with the same effect as though made at and as of such date.

(b)      Purchaser shall have duly performed and complied in all material respects with all agreements, covenants and conditions required by this Agreement and each of the Ancillary Documents to be performed or complied with by it prior to or on the Closing Date.

(c)      The Sale Order shall have been entered by the Bankruptcy Court. The Sale Order must be in effect and must not have been reversed or stayed or modified in any material respect.

(d)      No injunction or restraining order shall have been issued by any Governmental Authority, and be in effect, which restrains or prohibits any material transaction contemplated hereby.

28

(e)    All approvals, consents and waivers that are listed on Section 5.03 of the Disclosure Schedules shall have been received, and executed counterparts thereof shall have been delivered to Seller at or prior to the Closing.

(f)    Purchaser shall have delivered to Seller duly executed counterparts to the Ancillary Documents and such other documents and deliveries set forth in Section 3.02(b).

(g)    Seller shall have received a certificate, dated the Closing Date and signed by a duly authorized officer of Purchaser, that each of the conditions set forth in Section 7.03(a) and Section 7.03(b) have been satisfied (the "Purchaser Closing Certificate").

(h)    Purchaser shall have delivered to Seller such other documents or instruments as Seller reasonably requests and are reasonably necessary to consummate the transactions contemplated by this Agreement.

**ARTICLE VIII**
**SURVIVAL**

**Section 8.01    Survival.** The representations and warranties of the Parties contained in this Agreement or in any other certificate or writing delivered in connection herewith shall be extinguished and not survive the Closing. The covenants and agreements of the Parties that by their terms are to be performed after the Closing (or that are expressly intended to survive Closing as set forth herein) shall survive the Closing for such terms.

**ARTICLE IX**
**TERMINATION**

**Section 9.01    Termination.** This Agreement may be terminated and the transactions contemplated herein may be abandoned at any time prior to the Closing:

(a)    by the mutual written consent of Seller and Purchaser;

(b)    by Seller or Purchaser in the event that the Bankruptcy Court enters an Order approving the sale of the Purchased Assets to a third-party purchaser, unless due to the failure of the party seeking to terminate this Agreement to perform in any material respect its obligations under this Agreement required to be performed by it at or prior to the Closing;

(c)    by Purchaser upon written notice to Seller:

(i)    at any time and for any reason prior to 5:00 p.m. Eastern Time on the last day of the Due Diligence Period in accordance with Section 6.03;

(ii)    in the event of a Casualty or a taking contemplated by Section 6.04(a) or (b), respectively, subject to the terms and conditions of such applicable Section;

(iii)    if Purchaser is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Seller pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Seller within ten (10) days of Seller's receipt of written notice of such breach from Purchaser; or

29

(iv)    if any of the conditions set forth in Section 7.01 or Section 7.02 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the sixtieth (60th) day following the end of the Due Diligence Period, unless such failure shall be due to the failure of Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(d)    by Seller by written notice to Purchaser if:

(i)    Seller is not then in material breach of any provision of this Agreement and there has been a breach, inaccuracy in or failure to perform any representation, warranty, covenant or agreement made by Purchaser pursuant to this Agreement that would give rise to the failure of any of the conditions specified in ARTICLE VII and such breach, inaccuracy or failure has not been cured by Purchaser within ten (10) days of Purchaser's receipt of written notice of such breach from Seller; or

(ii)    any of the conditions set forth in Section 7.01 or Section 7.03 shall not have been, or if it becomes apparent that any of such conditions will not be, fulfilled by the sixtieth (60th) day following the end of the Due Diligence Period, unless such failure shall be due to the failure of Seller to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing; or

(e)    by Purchaser or Seller in the event that (i) there shall be any Law that makes consummation of the transactions contemplated by this Agreement illegal or otherwise prohibited or (ii) any Governmental Authority shall have issued a Governmental Order restraining or enjoining the transactions contemplated by this Agreement, and such Governmental Order shall have become final and non-appealable.

**Section 9.02    Effect of Termination.**  In the event of the termination of this Agreement in accordance with this Article IX, this Agreement shall forthwith become void and there shall be no liability on the part of any Party hereto except:

(a)    that the obligations set forth in this ARTICLE IX and ARTICLE X hereof shall survive termination; and

(b)    that nothing herein shall relieve any Party from liability for any willful breach of any provision hereof.

## ARTICLE X
## MISCELLANEOUS

**Section 10.01    Expenses.**  Except as otherwise expressly provided herein, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the Party incurring such costs and expenses, whether or not the Closing shall have occurred.

**Section 10.02    Notices.**  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business

Day if sent after normal business hours of the recipient or (d) on the third (3rd) day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the following addresses (or at such other address for a Party as shall be specified in a notice given in accordance with this Section 10.02):

| | |
|---|---|
| If to Seller: | Johnston & Rhodes Bluestone Co.<br>c/o Peter Johnston<br>257 Rockland Road<br>Roscoe, New York 12776 |
| with a copy (which shall not constitute notice) to: | Genova, Malin & Trier LLP<br>1136 Route 9<br>Wappingers Falls, New York 12590<br>Attn:  Michelle Trier, Esq.<br>Email:  michelle@gmtllp.com |
| If to Purchaser: | Aden Mining & Materials, Inc.<br>574 NY-416<br>Montgomery, New York 12549<br>Attn:  Nick Fitzpatrick<br>Email: nfitzpatrick@adenmoves.com |
| with a copy (which shall not constitute notice) to: | Couch White, LLP<br>540 Broadway, P.O. Box 22222<br>Albany, New York 12201-2222<br>Attn:    John E. Ahearn, III, Esq.<br>            and Harold D. Gordon, Esq.<br>Email: jahearn@couchwhite.com and<br>hgordon@couchwhite.com |

**Section 10.03   Interpretation.**   For purposes of this Agreement, (a) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation"; (b) the word "or" is not exclusive; and (c) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (x) to Articles, Sections, Disclosure Schedules and Exhibits mean the Articles and Sections of, and Disclosure Schedules and Exhibits attached to, this Agreement; (y) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and (z) to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder. This Agreement shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. The Disclosure Schedules and Exhibits referred to herein shall be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

**Section 10.04   Headings.**   The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section 10.05   Severability.**   If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal or unenforceable, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original

intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 10.06    Entire Agreement.**  This Agreement and the Ancillary Documents constitute the sole and entire agreement of the Parties with respect to the subject matter contained herein and therein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the Ancillary Documents, the Exhibits and Disclosure Schedules (other than an exception expressly set forth as such in the Disclosure Schedules), the statements in the body of this Agreement will control.

**Section 10.07    Successors and Assigns.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld, conditioned or delayed; provided, that prior to the Closing Date, Purchaser may, without the prior written consent of Seller, assign all or any portion of its rights under this Agreement to one or more of its direct or indirect wholly-owned subsidiaries. No assignment shall relieve the assigning Party of any of its obligations hereunder.

**Section 10.08    No Third-Party Beneficiaries.**  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 10.09    Amendment and Modification; Waiver.**  This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each Party hereto. No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the Party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section 10.10    Governing Law; Submission to Jurisdiction; Waiver of Jury Trial.**

(a)    This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York without giving effect to any choice or conflict of law provision or rule (whether of the State of New York or any other jurisdiction). In connection with any controversy arising out of or relating to this Agreement, Seller and Purchaser hereby irrevocably consent to the exclusive jurisdiction of the Bankruptcy Court, or, if and only if the Bankruptcy Case has been closed, any state or federal court having competent jurisdiction over the Southern District of New York. Seller and Purchaser each irrevocably consents to service of process out of the aforementioned courts and waives any objection which it may now or hereafter have to the laying of venue of any action or proceeding arising out of or in connection with this Agreement brought in the aforementioned courts.

(b)    EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE ANCILLARY DOCUMENTS IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE ANCILLARY

4854-1597-0263, v. 7

DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY TO THIS AGREEMENT CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10(b).

**Section 10.11    Specific Performance.**  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**Section 10.12    Counterparts.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be duly executed as of the date first written above.

SELLER:

**JOHNSTON & RHODES BLUESTONE CO.**

By:   *Peter Johnston*

Name: Peter Johnston

Title:  President

PURCHASER:

**ADEN MINING & MATERIALS, INC.**

By:

Name: Nick Fitzpatrick

Title:  President

**ACCEPTED AND AGREED AS TO
SECTION 2.10 ONLY:**

ESCROW AGENT:

*Lori Bertsch*

**Lori Bertsch-Brustman**

*[Signature Page to Asset Purchase Agreement]*

SCHEDULE 2.01(b)

<u>Assigned Contracts</u>

1. Lease & Agreement, dated July 3, 2013, by and between Stanley Shaffer, as lessor, and Johnston & Rhodes Bluestone Co., as lessee (Stanley Shaffer Quarry)
2. Lease & Agreement, dated July 18, 2017, by and between Stanley Shaffer, as lessor, and Johnston & Rhodes Bluestone Co., as lessee (Stanley Shaffer Quarry)
3. Lease & Agreement, dated January 4, 2022, by and between Jan Brul Hardt, as lessor, and Johnston & Rhodes Bluestone Co., as lessee
4. Lease & Agreement, dated February 14, 2022, by and between Baxter Mountain Landowners, Inc., as lessor, and Johnston & Rhodes Bluestone Co., as lessee
5. Lease & Agreement, dated June 12, 2023, by and between Soutlrst Club Inc., as lessor, and Johnston & Rhodes Bluestone Co., as lessee
6. Any lease agreement(s) by and between Bette Jo O'Brien (or such person's predecessors or successors), as lessor, and Johnston & Rhodes Bluestone Co., as lessee, with respect to that certain property known as "Dirig Quarry"
7. Any lease agreement(s) by and between Carl W. Scheetz (or such person's predecessors or successors), as lessor, and Johnston & Rhodes Bluestone Co., as lessee, with respect to that certain property known as "Fiumera-Sheetz Quarry"

SCHEDULE 2.01(d)

Vehicles and Equipment

| DESCRIPTION | VIN/SERIAL NO. |
|---|---|
| 1977 Johnson Trailer | 77967 |
| 1987 GMC Truck | 1GDM8C1Y171V519195 |
| 1978 Kenworth Tractor | 157701S |
| 1983 Diamond Reo Truck | 1D9AC2180D1009225 |
| 1981 Diamond Reo Truck | 1D9AC4186B1009061 |
| 1986 International F30 Truck | 2HSFBT5R6GCA16648 |
| 1989 Mack RB6 Truck | 2M2AM18CXKC001211 |
| 2011 GMC Sierra Pickup Truck | 1GT120CG9BF188119 |
| 1977 Autocar Dump Truck | PSIFJGH085580 |
| 1979 Hercules Trailer | 7940H609 |
| 1995 Evaco Trailer | 472D04823SA000338 |
| 2000 Raven Trailer | 1R1F94827YK500281 |
| 1994 Utility Trailer | 1UYFS2428RA162401 |
| 1991 Lufkin Trailer | 1L01B4828M1092844 |
| 1997 Riley Truck | 1R9AE4024TA262019 |
| 2000 Raven Trailer | N/A |
| 2000 Raven Trailer | N/A |
| 1969 Trailmobile (Rocktrail) Trailer | 61675581000SP |
| 1987 Great Dane Trailer | 8GROM902XHM045209 |
| 1998 South Trailer | 4Y3US1625WS002967 |
| 1979 GA/DE Trailer | 722109 |
| Komatsu Excavator – Model PC300LC | 13774 |
| Komatsu Excavator – Model PC300LC | 12694 |
| Novamac Drill – Model HE-114-V | HE11405255 |
| Novamac Drill – Model HE-114-V | HE11405250 |
| Tamrock Drill | 982501 |
| Tamrock Drill – Model DHA500 | 609615 |
| Tamrock Commando Drill | 4083513 |
| Ingersol Rand Compressor – Model 1400CF | 187824490680 |
| Ingersol Rand Compressor – Model 185CF | N/A |
| Ingersol Rand Compressor – Model 185CF | N/A |
| CAT 350 Excavator | N/A |
| Taylor GT-360 Forklift | S-27-21800 |
| Hyster H80FT Forklift | N005V03120E |
| Hyster H80FT Forklift | N005V03128E |
| CAT 988B Loader | 2ZR01002 |
| New Holland L985 Skidsteer | 218 |
| CAT HX100P1 Generator | D3335A/002 |
| Kawasaki 95Z Loader | 97025019 |
| GMM Axia Saw | 1391 |
| GMM Axia Saw | 1395 |
| GMM Axia Saw | 1443 |
| GMM Axia Saw | 1444 |
| Wilson Saw (11'-6") | N/A |

| | |
|---|---|
| Wilson Saw (10'-0") | N/A |
| Wilson Saw (7'-6") | N/A |
| Wilson Saw (4'-0") | N/A |
| JetEdge Water Jet | N/A |
| TE Stone Saw Line | N/A |

4854-1597-0263, v. 7

SCHEDULE 2.01(h)

Leased Equipment

| EQUIPMENT | LESSOR |
|---|---|
| 2001 Cat 980G Wheel Loader (S/N 2KR04256) | Ascentium Capital LLC |
| Two (2) forklifts Model Nos. FG25T-16 (S/N A412380 and A411446) | Wells Fargo Bank, N.A. |
| Copier/Printer | Wells Fargo Bank, N.A. |
| Saw line – parallel cut stone 44" x 10' cut off saw (S/N 2018090-B); cross cut stone 44" x 10' cut off saw (S/N 2018090-B); extension table 10' x 44" with solid axle rollers; extension table 5' x 44" with solid axle rollers; extension table 6' x 44" with solid axle rollers | F.N.B. Equipment Finance |
| 2012 Hyundai Robex 320LC-9 Excavator (S/N HZ901CC0000257) | F.N.B. Equipment Finance |
| 2012 Toyota 7FGU35 Lift Truck | F.N.B. Equipment Finance |

Docusign Envelope ID: DF533C8C-E0B6-4D30-B250-E35FBE330A85

SCHEDULE 2.07

Allocation of Purchase Price

| Asset Class under Section 1060 of the Code | Examples of Class Assets | Agreed-Upon Fair Market Value |
|---|---|---|
| I | Cash | N/A |
| II | Actively traded securities | N/A |
| III | Accounts Receivable | N/A |
| IV | Inventory | $100,000 |
| V | Furniture, fixtures, vehicles, equipment and other long-term assets | $1,800,000[1] |
| VI | "Section 197 intangible" assets described in Section 197 of the Code other than goodwill and going concern | N/A |
| VII | Goodwill and going concern value | N/A |

[1] Breakdown of Allocation: (A) $200,000 to Reynolds Quarry Property (Tax Map 408-1-13), (B) $200,000 to Shinhopple Quarry Property (Tax Map 356-2-13.5), (C) $1,200,000 to East Branch Mill Site (Tax Map 420.2.-1-8 and 420.2-2-37.2), and (D) $200,000 to machinery and equipment.

SCHEDULE 7.02(i)

Specified Governmental Permits

1. New York State Department of Environmental Conservation, Mined Land Reclamation Permit, No. 4-1224-00022/00006 (Mined Land ID 40661), effective 3/5/2019, Expiration Date 3/4/2024 (Shinhopple Quarry)

2. New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1242-00071/00001 (Mined Land ID 40710), Effective June 18, 2021, Expiration Date 6/17/2026 (Fiumera-Scheetz Quarry)

3. New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1224-00249/00001 (Mined Land ID 40737), Effective 6/16/2022, Expiration Date 6/15/2027 (Signor Quarry)

4. New York State Department of Environmental Conservation, State Pollutant Discharge Elimination System (SPDES) Permit No. NY 0104256, Effective 4/1/2022, Expiration Date 3/31/2027 (East Mill Branch Site)

5. New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1236-00367/00001 (Mined Land ID 40767 (Dirig Quarry)

## DISCLOSURE SCHEDULES

Reference is hereby made to that certain Asset Purchase Agreement (the "Agreement"), dated as of October 24, 2024, by and between Johnston & Rhodes Bluestone Co., a New York corporation ("Seller"), and Aden Mining & Materials, Inc., a New York corporation ("Purchaser"). These Disclosure Schedules (the "Disclosure Schedules" or, any of them, a "Schedule") of the Seller relate to certain matters concerning the Seller or the business and operation of the Seller.

These Disclosure Schedules are qualified in their entirety by reference to the specific provisions of the Agreement and are not intended to constitute, and shall not be construed as constituting, any representation or warranty of the Seller, except as and to the extent expressly provided in the Agreement. Capitalized terms used, but not defined, in these Disclosure Schedules shall have the meaning(s) ascribed to them within the Agreement unless the context in which they are presented in these Disclosure Schedules indicates otherwise.

These Disclosure Schedules may include items or information that the Seller is not required to disclose under the Agreement and, in such event, disclosure of such items or information shall not affect (directly or indirectly) the scope of the disclosure obligation of the Seller under the Agreement. Nothing in these Disclosure Schedules constitutes an admission of any liability or obligation of the Seller to any third party, nor is anything contained in these Disclosure Schedules an admission of any liability or obligation to any third party with respect to the Seller, as applicable. In disclosing this information, the Seller does not waive any attorney-client privilege associated with any such information or any protection afforded by the "work product doctrine" with respect to any of the matters disclosed or discussed herein.

Any item disclosed in any particular part of the Disclosure Schedules shall be deemed to be disclosed in other parts of the Disclosure Schedules to the extent the relevance to another section or sections of the Disclosure Schedule is readily apparent on its face to a reader without reference to extrinsic materials or any other document referenced herein.

Section 4.01

Jurisdictions

New York

Pennsylvania

Section 4.03

Consents

<u>Contracts or Permits Requiring Notice</u>

None.

<u>Contracts or Permits Requiring Consent</u>

1. Commonwealth of Pennsylvania Department of Environmental Protection, Mining Permit No. 64112502, Expiration Date 10/23/2032 (Peterson Quarry)
2. New York State Department of Environmental Conservation, Mined Land Reclamation Permit, No. 4-1224-00022/00006 (Mined Land ID 40661), effective 3/5/2019, Expiration Date 3/4/2024 (Shinhopple Quarry)
3. New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1242-00071/00001 (Mined Land ID 40710), Effective June 18, 2021, Expiration Date 6/17/2026 (Fiumera-Scheetz Quarry)
4. New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1224-00249/00001 (Mined Land ID 40737), Effective 6/16/2022, Expiration Date 6/15/2027 (Signor Quarry)
5. New York State Department of Environmental Conservation, State Pollutant Discharge Elimination System (SPDES) Permit No. NY 0104256, Effective 4/1/2022, Expiration Date 3/31/2027 (East Mill Branch Site)
6. New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1236-00367/00001 (Mined Land ID 40767 (Dirig Quarry)

Section 4.05

<u>Assigned Contracts</u>

The Seller is currently in default under the Equipment Leases.

Section 4.08

Owned Real Property

| Address | Tax Map Parcel ID | Current Use |
|---|---|---|
| 34 Bridge Street (Fish Road), East Branch, New York (12.74 acres) | 420.2.-1-8 420.2-2-37.2 | Mill site and office building |
| Shinhopple Rock Quarry, Trout Brook Road, Colchester, New York 13755 (25.9 acres) | 356-2-13.5 | Rock Quarry |
| Reynolds Rock Quarry, Quarry Road, Hancock, New York (42.49 acres) | 408-1-13 | Rock Quarry |

Section 4.08(a)

Encumbrances on Owned Real Property

There are outstanding real property and school taxes with respect to the Owned Real Properties that will be satisfied pursuant to the Bankruptcy Case. Such parcels of Owned Real Property will be transferred to the Seller at Closing free and clear of any Encumbrances with respect to such overdue real property and school taxes pursuant to the Sale Order.

Section 4.08(b)

Leased Real Property

| Address | Lease Agreement | Current Use |
|---|---|---|
| Baxter Mountain Road, Colcester, New York | Lease & Agreement, dated July 3, 2013, by and between Stanley Shaffer, as lessor, and Johnston & Rhodes Bluestone Co., as lessee<br><br>Lease & Agreement, dated July 18, 2017, by and between Stanley Shaffer, as lessor, and Johnston & Rhodes Bluestone Co., as lessee | Signor Quarry |
| Cummings Road, Masonville, NY | Lease Agreement between Carl W. Scheetz, as lessor, and Johnston & Rhodes Bluestone Co., as lessee (*a copy of the lease cannot be located*) | Fiumera-Scheetz Quarry |
| Draper Quarry, Hancock, New York | Lease & Agreement, dated January 4, 2022, by and between Jan Brul Hardt, as lessor, and Johnston & Rhodes Bluestone Co., as lessee | Quarry |
| Baxter Mountain Road, Colcester, New York | Lease & Agreement, dated February 14, 2022, by and between Baxter Mountain Landowners, Inc., as lessor, and Johnston & Rhodes Bluestone Co., as lessee | Quarry |
| Route 97 and French Woods Road, Hancock, New York | Lease & Agreement, dated June 12, 2023, by and between Soutlrst Club Inc., as lessor, and Johnston & Rhodes Bluestone Co., as lessee | Quarry |
| Hancock, New York | Lease Agreement between Bette Jo Obrien, as lessor, and Johnston & Rhodes Bluestone Co., as lessee (*a copy of the lease cannot be located*) | Dirig Quarry |

Section 4.09

Intellectual Property

Intellectual Property Registrations

None.

Unregistered Trademarks



Section 4.10

<u>Insurance</u>

(See attached)

Section 4.11(a)

<u>Actions</u>

None.

Section 4.11(b)

<u>Orders</u>

None.

Section 4.12(b)

Permits

1.  Commonwealth of Pennsylvania Department of Environmental Protection, Mining Permit No. 64112502, Expiration Date 10/23/2032 (Peterson Quarry)

2.  New York State Department of Environmental Conservation, Mined Land Reclamation Permit, No. 4-1224-00022/00006 (Mined Land ID 40661), effective 3/5/2019, Expiration Date 3/4/2024 (Shinhopple Quarry)

3.  New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1242-00071/00001 (Mined Land ID 40710), Effective 6/18/2021, Expiration Date 6/17/2026 (Fiumera-Scheetz Quarry)

4.  New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1224-00249/00001 (Mined Land ID 40737), Effective 6/16/2022, Expiration Date 6/15/2027 (Signor Quarry)

5.  New York State Department of Environmental Conservation, State Pollutant Discharge Elimination System (SPDES) Permit No. NY 0104256, Effective 4/1/2022, Expiration Date 3/31/2027 (East Mill Branch Site)

6.  New York State Department of Environmental Conservation, Mined Land Reclamation Permit No. 4-1236-00367/00001 (Mined Land ID 40767 (Dirig Quarry)

Section 4.13(b)

Environmental Permits

The information contained in Section 4.12(b) of these Disclosure Schedules is hereby incorporated by reference.

Section 4.14

Taxes

(a)    The disclosure set forth in Section 4.08(a) of these Schedules is hereby incorporated by reference.

(b)    None

(c)    None

(d)    None

(e)    None

(f)    None

(g)    None